## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-245


## SUCCESSION OF JAMES OLIVER LOVE


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 40,853
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and D. Kent Savoie, Judges.


**AFFIRMED.**

**Leslie F. Halle**
**Gold, Weems, Bruser, Sues & Rundell**
**P. O. Box 6118**
**Alexander, LA 71307-6118**
**Telephone: (318) 445-6471**
**COUNSEL FOR:**
    **Other Appellant - Manor Love**

**Penny H. Tullos**
**Stafford, Stewart & Potter**
**P. O. Box 1711**
**Alexandria, LA 71309-1711**
**Telephone: (318) 487-4910**
**COUNSEL FOR:**
    **Other Appellee - Rebecca Love**

**THIBODEAUX, Chief Judge.**

The Succession of James Oliver Love, represented by his brother, Manor Love Sr., appeals a judgment in favor of the decedent's spouse, Rebecca Love, finding that two deposit accounts at Capital One Bank were the subjects of valid donations inter vivos by James Love to Rebecca Love. Finding no manifest error in the trial court's judgment, we affirm.

## I.

## ISSUES

We must decide:

(1)     whether the trial court manifestly erred in granting a new trial and finding that the facts supported an inter vivos donation of insurance proceeds by the decedent to his spouse; and

(2)     whether the trial court erred as a matter of law in finding an inter vivos donation of insurance proceeds by the decedent to his spouse.

## II.

## FACTS AND PROCEDURAL HISTORY

James Oliver Love owned a house in St. Landry Parish. He had no children. James began dating Rebecca Tisdale Love. Rebecca owned a home in Rapides Parish. James and Rebecca resided together in Rebecca's home for the last four and a half years of James's life, but they did not legally marry until June of 2012, after a series of life-changing events leading to James's death in August 2012.

In April 2012 James went to check on his house in Opelousas, and an unknown gas leak caused an explosive fire, injuring James and destroying his house. In May 2012 James was diagnosed with terminal cancer and given only a short time to live. At the end of May, James received approximately $130,000.00 in insurance proceeds which he deposited in a savings account and a checking account with Capital One Bank. James spent his last two months setting his affairs in order.

In June of 2012, James married Rebecca, and the couple went to the bank to sign signature cards, making the Capital One accounts joint accounts. James hired a driver to help him deliver items he owned, such as his tools, to people he wished to have them. On July 2, 2012, James and Rebecca, and James's brother, Manor Love Sr., went to attorney Bruce Gaudin to take care of James's remaining assets. At his brother's request, James left his immovable property to his nephew, Manor Love Jr., by executing a donation inter vivos in the nephew's favor.[1] The act of donation gave two lots in St. Landry Parish to Manor Love Jr., but it reserved to James any claim that he might have against Evangeline Gas Company for the fire that had destroyed his house.

Also on July 2, 2012, James executed an unlimited power of attorney in favor of Rebecca, giving her full authority, without reservation, to conduct all of his affairs. The rights and powers granted included acting for him judicially, making and receiving donations, withdrawing funds from any and all accounts, and donating or pledging any property right owned or to be acquired by him, whether it be movable, immovable, corporeal, or incorporeal. James told Rebecca that he wanted her to have the funds in the joint accounts, and to pay all community debts

_____

[1]James intended to leave the house to Manor Love Sr.

2

and separate debts, including the balance on the mortgage on her home where they resided together. He wanted her to be debt free before he died. He expressed his wishes to others that he did not want her to have to go through a succession to get the funds. Rebecca began to carry out his wishes but had not completed the transactions when James died. Rebecca cared for James until he died on August 3, 2012, in Rebecca's home, in a hospital bed in the couple's bedroom.

Nine years earlier, in 2003, unbeknownst to Rebecca, James had executed a brief one-page will. The will left two household items to one individual and left the remainder of his estate to his brother, Manor Love Sr. The will also designated Manor Love Sr. as the executor of James's estate.

Several months after James's death, Manor Love, Sr. (the Succession) filed a petition to have Rebecca return the funds that she withdrew from the joint accounts. Initially, the trial court found in favor of the Succession, ordering Rebecca to return $91,527.55 of the $129,047.94 deposited in the accounts. Rebecca's motion for a new trial was granted, resulting in a judgment in her favor, and dismissing the claims of the Succession. It is from this judgment that the Succession appeals.

### III.

### STANDARDS OF REVIEW

Donative intent is a factual issue subject to the manifest error standard of review. *Rose v. Johnson*, 06-518 (La.App. 3d Cir. 9/27/06), 940 So.2d 181, *writ denied*, 06-2528 (La. 12/15/06), 944 So.2d 1273. Thus, a trial court's finding on this issue cannot be reversed unless an appellate court, after review of the entire record, finds both that no reasonable factual basis exists for the finding and that it

3

is manifestly erroneous or clearly wrong. *See Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993). In applying this standard, a trial court's credibility determinations are entitled to great deference. *Hebert v. Rapides Parish Police Jury*, 06-2001 (La. 1/16/08), 974 So.2d 635 (on rehearing). The reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse even if it is convinced that had it been sitting as trier of fact it would have weighed the evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). This principle is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts. *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973). Statutory interpretation is subject to a de novo review on appeal. *Harrah's Bossier City Inv. Co., LLC v. Bridges*, 09-1916 (La. 5/11/10), 41 So.3d 438.

IV.

## LAW AND DISCUSSION

The Succession contends that the trial court erred in granting Rebecca a new trial and then in finding that James completed a valid donation inter vivos to Rebecca of the insurance proceeds that he had placed in joint accounts bearing both his name and Rebecca's name. The crux of the Succession's argument turns on the fact that James did not execute an authentic act entitled "donation inter vivos" in conjunction with the other written acts concerning the funds in the joint accounts in the weeks before his death. We find that James did complete a valid donation inter vivos to Rebecca.

"A donation inter vivos is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it." La.Civ.Code art. 1468. "Every donation made . . . by a married person to his or her spouse shall be as irrevocable as if made to a stranger." La.Civ.Code art. 2351. "A donation inter vivos is without effect until it is accepted by the donee. The acceptance shall be made during the lifetime of the donor." La.Civ.Code art. 1544. "The acceptance of a donation may be made in the act of donation or subsequently in writing." *Id*. "When the donee is put into corporeal possession of a movable by the donor, possession by the donee also constitutes acceptance of the donation." *Id*. "A donation is effective upon acceptance. When the donation is effective, the ownership or other real right in the thing given is transferred to the donee." La.Civ.Code art. 1551.

Generally, a donation inter vivos of a corporeal movable can be accomplished by manual delivery, pursuant to La.Civ.Code art. 1543,[2] while the donation of an incorporeal movable requires an authentic act, unless the law provides otherwise, pursuant to La.Civ.Code art. 1541.[3] It has long been held that "[a]n account on deposit is an incorporeal right." La.Civ.Code art. 473;[4] *Broussard v. Broussard*, 340 So.2d 1309, 1313 (La.1976). However, there are *numerous exceptions* to the form requirement of Article 1541. La.Civ.Code art.

---

[2]"The donation inter vivos of a corporeal movable may also be made by delivery of the thing to the donee without any other formality." La.Civ.Code art. 1543.

[3]"A donation inter vivos shall be made by authentic act under the penalty of absolute nullity, unless otherwise expressly permitted by law." La.Civ.Code art. 1541.

[4]"Rights, obligations, and actions that apply to a movable thing are incorporeal movables. Movables of this kind are such as bonds, annuities, and interests or shares in entities possessing juridical personality." La.Civ.Code art. 473.

1541, Revision Comment (b), Revision Comments–2008. Additionally, the substantive requirements of divestment and donative intent must be fulfilled in order to effect a valid donation. *Rose v. Johnson*, 940 So.2d 181.

### *INTENT*

In her memorandum supporting her motion for a new trial, Rebecca submitted that the trial court's earlier judgment against her was contrary to the law and evidence and should be reversed pursuant to La.Code Civ.P. arts. 1971 and 1972. The trial court agreed and issued written reasons for the new judgment in her favor, stating that it had found her most credible and that she had provided strong and convincing evidence of James's donative intent. We find no manifest error in the trial court's conclusions in that regard.

As Rebecca pointed out, she was directed by James to pay off her debts and his debts using the funds in the Capital One joint accounts, and he checked with her each day to make sure that she was paying off the debts as he requested. In compliance with his direction, she paid off three debts totaling $33,938.09, via electronic transactions, prior to James's death. It has long been held that the withdrawal of funds under those circumstances meets the requirements for the manual delivery of a corporeal movable, i.e., the funds, pursuant to former La.Civ.Code art 1539, now La.Civ.Code art. 1543.

In *Succession of Miller*, 405 So.2d 812 (La.1981), the Louisiana Supreme Court found that where the donor expressed her unqualified intent on several occasions that the donee have money from the donor's savings account, and where the donee withdrew the funds before the donor's death in accordance with the donor's wishes, there was a valid inter vivos donation by manual gift of

6

the funds. When the donor's will to give and the donee's actual possession of the movable property operate simultaneously, there is a sufficient delivery to constitute a valid manual donation inter vivos. *Succession of Hunt*, 47,372 (La.App. 2 Cir. 9/20/12), 135 So.3d 654.

The donee of a manual gift must show by strong and convincing proof that the donor had intent to irrevocably divest himself of a thing and that delivery was made; outward acts, together with any admissible evidence of the relationship of the parties, are important to prove a manual donation. *Broussard v. Crochet, Broussard & Co.*, 477 So.2d 166 (La.App. 3 Cir. 1985). The deposition testimony of Christopher Berrier and Julie Berrier corroborated Rebecca's testimony regarding James's donative intent. Each testified to the close relationship that they shared with Rebecca and James and to the time their family spent with the couple. In particular, they testified that James specifically told them that he wanted to take care of Rebecca financially. Julie Berrier explained that James wanted Rebecca to be able to pay some things off with the money that he was leaving her. This testimony of Christopher and Julie Berrier was uncontradicted by the Succession.

In further support of James's donative intent at the end of his life was evidence of his acts of divestment of his possessions after he was diagnosed with terminal cancer in May 2012. These acts included: the signature cards signed at the bank authorizing Rebecca to withdraw funds in June before he died in August; the unlimited power of attorney that he executed in favor of Rebecca on July 2 before attorney Bruce Gaudin; the inter vivos donation of his immovable property to his nephew, also executed before Bruce Gaudin on July 2; and his donation of all of his tools, guns, and vehicles to his friends and family. All of these outward acts demonstrate a pattern of behavior by James that support his donative intent

7

after the gas fire in April, which destroyed his house. Even his marriage to Rebecca in June, after living with her for over four years, indicates that he wanted to legally reinforce the other intentional steps he was taking to provide for her after he was gone. Of particular import is the power of attorney.

## THE POWER OF ATTORNEY

The record contains Rebecca's affidavit stating that, after James was diagnosed with terminal cancer and given only a short time to live, the couple met with attorney Bruce Gaudin to settle James's affairs. She averred that James told Mr. Gaudin about the diagnosis and said he wanted to take care of his affairs so that no legal proceedings would have to be filed after he died. She further stated that James expressed his desire that Rebecca not be left to worry about any medical bills, funeral and burial expenses, or any outstanding separate or community debts. Accordingly, Mr. Gaudin prepared, and James executed, a donation inter vivos, giving his nephew two lots in St. Landry Parish, and an unlimited power of attorney giving Rebecca power over all of his remaining property and rights of every kind. The pertinent parts of the power of attorney designated Rebecca . . .

> to be his agent and attorney-in-fact, granting to the said AGENT full authority to act for him in the conduct of all of his affairs. Said Agent shall have full authority to act. The mandate granted herein to include, but not be limited to, full authority to:
>
> (1) Open and answer all correspondence.
>
> (2) Deposit in and withdraw from any banks or financial institutions any and all funds, notes, certificates and financial instruments for account of PRINCIPAL.
>
> (3) Make and endorse promissory notes and other evidence of indebtedness in

PRINCIPAL's name, and to draw, endorse and accept checks and bills of exchange;

(4) Borrow money on the notes or other obligations of PRINCIPAL, such to be executed on PRINCIPAL's behalf by AGENT.

(5) Buy, accept, or receive by donation, any type of property rights of PRINCIPAL.

(6) Sell, quitclaim, donate, partition, exchange, compromise, mortgage, assign, lease and/or pledge any or all property, interests or rights of any kind owned or to be acquired by PRINCIPAL, including rights in corporeal and incorporeal property, movables and immovables (specifically including all real estate interests owned by PRINCIPAL, wherever located), and to receive and receipt for any sums or rights receive thereby.

(7) Execute, in connection with the sale, quitclaim, donation, partition, exchange, compromise, mortgage, assignment, lease and/or pledge of property on behalf of PRINCIPAL, an[y] documents or agreements necessary to accomplish the foregoing, containing such terms as AGENT in his or her sole discretion deems advisable, including security clauses and confession of judgment.

. . . .

(11) Sue in PRINCIPAL's name and on PRINCIPAL'S behalf as well as be sued on behalf of PRINCIPAL, including the right to appear before all courts of law on PRINCIPAL's behalf for all purposes, and further to compromise or refer to arbitration any claims (whether asserted judicially or not) for or against PRINCIPAL, and to make transaction in matters of litigation.

(12) Extend or waive prescription on any obligations due to PRINCIPAL.

(13) Represent PRINCIPAL judicially or otherwise, whether as heir, legatee, creditor, executor, administrator or otherwise, in all successions or estates in which PRINCIPAL maybe or become interested, including any acceptance or renunciation thereof; to apply for the administration thereof and demand, obtain, and execute all orders an decrees as AGENT may deem proper therein; to settle, compromise and liquidate PRINCIPAL'S interest therein; and to receive and receipt for all property to which PRINCIPAL may be entitled in such successions or estates.

(14) Sign and file any and all Federal, State and local tax returns on PRINCIPAL's behalf and represent PRINCIPAL in any connection therewith.

(15) Employ, on PRINCIPAL's behalf, any legal, financial, accounting, geological or other assistance to reasonably protect PRINCIPAL's interests and rights.

(16) Accept or renounce a Succession.

(17) Make health care decisions for the PRINCIPAL, such as a surgery, medical expenses, nursing home residency, and medication.

(18) PRINCIPAL hereby grants unto the AGENT full release authority to obtain medical information concerning the PRINCIPAL. It is the intent of the PRINCIPAL that the AGENT shall be able to obtain any medical information concerning the PRINCIPAL, and any privacy rights granted to the PRINCIPAL by the Health Insurance Portability and Accountability Act (HIPAA) are waived. All physicians, hospitals, pharmacies, insurers and others are hereby directed to release the health records of the PRINCIPAL to the AGENT. This power of attorney supersedes any prior information-restricting agreement the PRINCIPAL may have given to health care providers.

It is the intent of PRINCIPAL in executing this mandate that said AGENT shall be empowered to act for PRINCIPAL in any and all matters, without reservation of any kind and to the fullest extent allowed by law, as completely as if PRINCIPAL were acting for himself; and that said AGENT shall have full power of substitution herein and power of revocation of said substitution.

In her motion for a new trial, Rebecca addressed the issue of donative intent in the power of attorney, pointing out as error the trial court's view that the power of attorney did not give Rebecca authority to make inter vivos donations to herself. In its written reasons for granting the new trial and finding strong donative intent in favor of Rebecca on other grounds, the trial court did not retract that view but stated summarily that the power of attorney "did not expressly authorize" Rebecca to make donations to herself. Contract interpretation involves questions of law, and those questions are reviewed de novo. *Wooley v. Lucksinger*, 09-0571 (La. 4/1/11), 61 So.3d 507. Accordingly, we find that, taken as a whole, and especially under the circumstances of impending death in this case, the power of attorney does expressly authorize Rebecca to withdraw funds from all accounts in paragraph (2) and to donate corporeal and incorporeal property and rights of any kind in paragraphs (6) and (7) without limitation.

Here, the power of attorney satisfies the laws of mandate requiring express authority to make inter vivos donations under La.Civ.Code art. 2997(1). Revision Comment (a) of that Article states: "There should be no doubt that under the Louisiana Civil Code of 1870, a principal may expressly authorize the mandatary to make a donation on behalf of the principal." *Id*. The Comment further states that in spite of tax and estate planning issues, "Civil Code Article

11

2997(1) (Rev. 1997) makes it clear that, under Louisiana law, a mandatary may be given authority to make gifts by virtue of an express mandate."

With regard to whose interest is being served, "[t]he contract of *mandate may serve the **exclusive** or the **common interest** of the **principal**, the **mandatary**, or a third person*." La.Civ.Code art. 2991 (emphasis added). As for the authority to donate to oneself, or self-deal, La.Civ.Code art. 2998 (emphasis added) states: "A mandatary who represents the principal as the other contracting party may not contract with himself *unless he is authorized by the principal, or, in making such contract, he is merely fulfilling a duty to the principal*." Our courts have found that, unlike the legislative intent in the language of Articles 2996 (authority to alienate) and 2997 above, the language of Article 2998 does not require that the authority to self-deal be expressed in writing; rather, the authority to self-deal can be oral.

In *Fernandez v. Hebert*, 06-1558 (La.App. 1 Cir. 5/4/07), 961 So.2d 404, *writ denied*, 07-1123 (La. 9/21/07), 964 So.2d 333, the first circuit found that the donor had intent to donate and the donor's nephew had express *oral* authority to act as mandatary and effect donations of stock to himself and his siblings, even though the residuary legatee of the donor's will claimed that the authority had to be in writing. In reaching this conclusion, the *Fernandez* court interpreted the articles on mandate by analyzing prior jurisprudence:

> In *Rutledge* [*v. Hibernia Corp.*, 00-0674 (La.App. 4 Cir. 1/16/02), 808 So.2d 765], the fourth circuit examined whether a petition for damages for alleged acts of negligence and breach of contract stated a cause of action. There, Rutledge had averred that as caretaker of the decedent, she had been given an unlimited power of attorney authorizing her to perform all acts for the decedent that she would be legally able to perform for herself. Rutledge subsequently assisted the decedent in

12

making two donations to family members. While at the bank acquiring funds for one of the donations, the decedent instructed Rutledge to cash a certificate of deposit and expressed her intent to donate the cashed funds to Rutledge. It was alleged that Rutledge properly completed the paperwork; a bank employee informed her that the paperwork would be sent to a New Orleans office for processing; and the bank employees were aware that Rutledge had a power of attorney from the decedent. After the decedent died, Rutledge returned to the bank to inquire about the delay in delivery of the certificate of deposit. She was advised an error had occurred and that the bank had failed to process the paperwork properly. Thus, the certificate of deposit was still in the decedent's name upon her death and believed to have been paid or delivered to the decedent's succession.

Noting that under the commercial laws, an instrument is transferred by delivery to someone other than its issuer for the purpose of giving the recipient the right to enforce the instrument and concluding that the power of attorney that Rutledge relied upon did not expressly authorize her to make donations, the court considered whether the allegations of the principal's verbal authority were sufficient to authorize her to make the donation to herself on behalf of the decedent. Pointing to La. C.C. art. 2998, which states "A mandatary who represents the principal as the other contracting party may not contract with himself unless he is authorized by the principal, or, in making such contract, he is merely fulfilling a duty to the principal," the *Rutledge* court applied that article to the allegations of the petition and held that no written authorization by the principal was required for a mandatary to self deal. [*Id.*] at 771. Thus, the *Rutledge* court concluded the petition stated a cause of action.

*Fernandez*, 961 So.2d at 410–11 (footnote omitted). The *Fernandez* court further found La.Civ.Code art. 2993 instructive: "The contract of mandate is not required to be in any particular form. Nevertheless, when the law prescribes a certain form for an act, a mandate authorizing the act must be in that form." In this case, the mandate to donate was written and was in fact in authentic form, i.e., the power of attorney, thus satisfying La.Civ.Code arts. 2997 and 2993. Because Rebecca was

13

authorized and instructed by James to use the funds for herself, La.Civ.Code art. 2998 is also satisfied.

Recently, in *Tatum v. Riley*, 49,670 (La.App. 2 Cir. 5/6/15), 166 So.3d 380, the second circuit found that the mother's power of attorney authorized the son to donate the mother's property to himself, despite claims of his half-siblings that the power of attorney had no express provision granting such authority. The court found that the power of attorney granted the son broad and express authority to act with regard to the mother's property; and that the mother expressly authorized the son to assign, sell, or otherwise dispose of property in any manner, including making gratuitous, onerous, or remunerative donations. The court found that the power of attorney was further evidence of donative intent: "[The mother] shared a joint account with [the son] and named him as her agent in the power of attorney. These facts suggest that she trusted him with her affairs and provide some further evidence of her donative intent, as expressed by the authority conferred upon [the son] in the power of attorney." *Tatum*, 166 So.3d at 385.[5]

Here, we find that the power of attorney did expressly give Rebecca unlimited power to withdraw the funds and make donations, and that James authorized her to use the funds for herself, or donate the funds to herself. We further find that the power of attorney was a means to facilitate the donation to Rebecca when paired with the intentional actions of making the accounts joint accounts and the instructions that James had given her about taking the funds and being debt free. *See Succession of Gorman*, 209 La. 1092, 26 So.2d 150 (La. 1946). This intent is corroborated in the testimony of Christopher and Julie Berrier

---

[5]*But see In re Succession of Hunt*, 47,372 (La.App. 2 Cir. 9/20/12), 135 So.3d 654, where the court found no intent and the authority to donate did not authorize the mandatary to make donations to himself, his wife, and his daughter.

regarding the funds James wanted to leave Rebecca and his satisfaction in knowing that he could do this for her. Moreover, all of these facts and all of James's actions in giving away his other property support a pattern of behavior indicating that James was engaged in estate planning. *See Fernandez*, 961 So.2d 404. This is also apparent where, on the same day that he executed the power of attorney, four weeks before he died, James executed a donation in favor of his nephew of the land he had formerly bequeathed to his brother in a 2003 will. *See Id*.

Finally, we point out that in *Rutledge*, 808 So.2d 765, the donee was found to have stated a cause of action against the bank based upon the donor's verbal instructions and authority to the donee, her mandatary, to self-donate under La.Civ.Code art. 2998. The donee began the process of transferring the certificate to her name under the power of attorney, but it was not completed, and she did not institute the action until after the death of the donor. At the time of the donor's death, the certificate was still in the donor's name and had not been converted to cash or withdrawn by the donee.

Similarly here, Rebecca began to withdraw funds from the joint accounts and pay bills as James wished under the power of attorney, but all of the funds had not been withdrawn. Under the facts of this case, we find that of no moment because we have found that the power of attorney was an authentic act which facilitated James's intent before he died to donate all of the funds to Rebecca. To find otherwise would be contrary to James's intent and would punish Rebecca for staying by James's side in the last four weeks of his life instead of running to the bank to vaporize the accounts.

The Succession contends that the trial court misinterpreted La.Civ.Code art. 1550 as providing an exception to the authentic act requirement for funds on deposit. We disagree. Article 1550 and its comments state as follows:

> Art. 1550. Form for donation of certain incorporeal movables
>
> The donation or the acceptance of a donation of an incorporeal movable of the kind that is evidenced by a certificate, document, instrument, or other writing, and that is transferable by endorsement or delivery, may be made by authentic act or by compliance with the requirements otherwise applicable to the transfer of that particular kind of incorporeal movable.
>
> In addition, an incorporeal movable that is investment property, as that term is defined in Chapter 9 of the Louisiana Commercial Laws, may also be donated by a writing signed by the donor that evidences donative intent and directs the transfer of the property to the donee or his account or for his benefit. Completion of the transfer to the donee or his account or for his benefit shall constitute acceptance of the donation.

The Comments to Article 1550 explain:

> (a) This Article is new. It is based in part on the provisions of former Civil Code Article 1536 (1870).
>
> (b) In this Article, the words "for his benefit" are included to cover situations when the transfer may not be directly to the donee's account, but would be used to pay something for his benefit, as for example, if the transfer is made to a bank to pay off a child's debt. The same phrase is used in Article 1505 concerning life insurance and retirement benefits.
>
> (c) Under Louisiana property law a check or promissory note is classified as an incorporeal movable. La. Civ. Code Art.

473. See *Succession of Franklin*, 968 So.2d 811, 42,496 (La. App. Cir. 10/17/07). The transfer of such an instrument, whether negotiable or non-negotiable, may be governed by Chapter 9 of the Louisiana Commercial Laws. A donation of such property may be by, but does not necessarily require, an authentic act.

There is an important distinction, however, between a donation of the check itself, which is an incorporeal movable, and the donation of the money or funds represented by the check. If A writes a check to B, and B endorses and delivers the check to C, the transfer to C is complete upon B's negotiation of the check to C. On the other hand, if A intends to make a gift to B of cash, and writes his personal check to B, but B does not cash the check before A dies, or B dies before cashing it, there is not a completed gift of the funds in the bank account.

At all times, donative intent is required, but assuming donative intent, this Article does not change the rule that an attempted donation of cash by use of a personal check does not constitute a completed gift unless and until the check is cashed. R.S. 10:3-203(a) provides that "an instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Thus, R.S. 10:3-105(c) provides that an issuer is a "maker or drawer of an instrument." Thus, R.S. 10:3-203(a) does not apply to the situation in which A gives his personal check to B intending to make a donation of the cash in A's checking account, because A is an "issuer" of his own personal checks, and therefore R.S. 10:3-203(a) does not apply.

Pursuant to the first paragraph of Article 1550, the Capital One accounts are evidenced by a writing and the right to withdraw funds is transferred

17

by endorsement. When James and Rebecca signed the signature cards at the bank, James signed to transfer the funds to Rebecca, and Rebecca signed to accept the funds. The signing of signature cards has long been a requirement of the bank for transferring accounts of deposit. In effect, Rebecca "negotiated" the transfer of the accounts to her when she endorsed the signature cards, accepting the gift. The language of Article 1550 does not limit its application to an account evidenced by a certificate or an instrument, or even a document; nor does it require delivery, as it states "transferrable by endorsement *or* delivery." La.Civ.Code art. 1550 (emphasis added). Moreover, its reference to "endorsement" does not use the spelling for the term of art "indorsement" that is used to sign over investment securities in Louisiana's Uniform Commercial Code–Investment Securities, at La.R.S. 10:8-102.[6] Instead, the language of Article 1550 is broad enough to cover incorporeal deposit accounts[7] that are transferred by endorsements on signature cards. Neither Article 1550 nor its Revision Comments, which are detailed and specific, precludes application of the first paragraph to the Capital One checking and savings accounts in this case. James did not write Rebecca a check for a specific amount that she failed to negotiate or cash, which the Revision Comments show would be fatal to her position. Rather, he donated all of the funds to her via the signature cards *and* he executed a power of attorney in authentic form to

---

[6] (11) "'Indorsement' means a signature that alone or accompanied by other words is made on a security certificate in registered form or on a separate document for the purpose of assigning, transferring, or redeeming the security or granting a power to assign, transfer, or redeem it." La.R.S. 10:8-102.

[7] The Capital One accounts were "deposit accounts" pursuant to Chapter 9 of Louisiana's Uniform Commercial Code–Secured Transactions: "'Deposit account' means a demand, time, savings, passbook, or similar account maintained with a bank. The term does not include investment property or accounts evidenced by an instrument." La.R.S. 10:9-102(a)(29). Since the definition of "deposit account" specifically excludes "investment property," the second paragraph of La.Civ.Code art. 1550 is not applicable.

facilitate that transfer. He was ill and dying and had no intention of going to the bank or taking control of the funds. In making the accounts Rebecca's accounts as well, he gave up the exclusive rights to control the accounts, and in the power of attorney, he reinforced Rebecca's right to control the accounts.

In *In re Succession of Gassiott*, 14-1019 (La.App. 3 Cir. 2/4/15), 159 So.3d 521, *writ denied,* 15-493 (La. 5/15/15), 170 So.3d 968, a panel of this court applied Article 1550 and found that the wife of the deceased accepted the gift of settlement proceeds in a joint account when she signed the signature cards and bank documents and could have withdrawn the funds at any time. *Id.* The panel also found that the decedent husband, in creating the joint account had, for all practical purposes, given up control when he gave his wife identical rights to the funds. *Id.* It further found that "there are potentially two means by which the donation inter vivos was effectuated: via donation at the time of creation of the joint savings account or via the conversion of the funds to a corporeal movable upon withdrawal thus requiring no formality." *Id*. at 525. Importantly, the court found that the donor had the intent to donate the account to his wife at the time he created the joint account, and she accepted in writing by signing the signature cards. Similarly here, the evidence is overwhelming that James took Rebecca to the bank and had her execute signature cards for the purpose of giving the account to her.

Following *Gassiott*, *In re Succession of Harrison*, 50,258 (La.App. 2 Cir. 11/18/15), 183 So.3d 579, quoted *Gassiott* and applied Article 1550 to an uncle's transfer of $92,000 to his niece by taking her to the bank and having the manager transfer the funds from his account to a new account in the niece's name. Importantly in *Harrison*, the niece did not withdraw any of the funds during the

life of the donor, so there was no acceptance by withdrawal that appellant urges as the only exception to an authentic act. Yet, the donation was found to be valid because of the donor's intent and the "extraordinary efforts" he went to in carrying out his wishes. The court found, pursuant to *Gorman*, that the parties used "the most expedient way of making and accepting the donation" and, as the supreme court in *Gorman* has stated, "the law takes no account of useless formalities." *Id.* at 581. The evidence here is even stronger where James knew he was dying, and all of his actions in his last two months show his intent in divesting himself of all of his possessions by giving them to those he loved. This was particularly true for Rebecca; he not only took her to the bank, he took her to the attorney's office and, wishing for there to be no succession proceedings and for her to have the funds "presently" while he was alive, he was advised to execute the power of attorney.

In response to *Gassiott*, the Succession cites *Succession of O'Krepki*, 16-50 (La.App. 5 Cir. 5/26/16), 193 So.3d 574. There, the fifth circuit overturned summary judgment in favor of the wife who had withdrawn funds from a joint account on the day of the decedent's death. The death however, was four years after the couple opened the joint account, and, finding evidence lacking for summary judgment, the appellate court remanded the case for a determination of intent by the donor and acceptance by the wife during the life of the donor, which is clearly not the case here before us.

As in *Gassiott, Harrison*, and *O'Krepki*, the Succession points to the older jurisprudence interpreting La.Civ.Code art. 1536, which provided no exceptions to the authentic-act requirement for the donation of incorporeal things. *See Succession of Miller*, 405 So.2d 812 (La.1981). Prior to revision of the applicable statutes, Article 1536 stated as follows: "An act shall be passed before a

notary public and two witnesses of every donation *inter vivos* of immovable property or incorporeal things, such as rents, credits, rights or actions, under the penalty of nullity." While bank accounts, stocks, and certificates of deposit were incorporeal movables which could only be donated by authentic act, the funds in the accounts qualified as corporeal movables, which could be donated by manual delivery, pursuant to La.Civ.Code art. 1539 (now La.Civ.Code art. 1543) as long as the joint account holder "accepted" the donation during the lifetime of the donor. *See Id.*

However, important changes have occurred in the laws affecting donations inter vivos since 1981. Following *Succession of Miller*, which found on rehearing that savings account funds were susceptible of manual delivery but money represented by bearer bonds was not, the legislature enacted a statute providing for a broad exception to Article 1536 in the form of negotiable instruments. More specifically, in 1982, the legislature enacted La.R.S. 10:3-201(4) which states:

> Donations inter vivos of negotiable instruments shall be governed by the provisions of this Chapter, notwithstanding any other provision of the Louisiana Civil Code or of any other law of this state relative to the form of donations inter vivos, to the contrary.

The paragraph was made remedial and retrospective, as we stated in *Succession of Walker*, 533 So.2d 70, 74 (La.App. 3 Cir. 1988), *writ denied,* 536 So.2d 1254 (La.1989):

> Any donation inter vivos of a negotiable instrument made on or before the effective date of this Paragraph, in accordance with the provisions of Chapter 3 of Title 10 of the Louisiana Statutes of 1950 or the Louisiana Civil Code or any other law of this state relative to the form of donations inter vivos, is valid.

21

In *Succession of Walker*, we determined that a certified cashier's check was a negotiable instrument, such that the provisions of Title 10 applied rather than the form requirements of the Louisiana Civil Code. *Id.*

Effective in 2009, the statutes on donations inter vivos were revised by Acts 2008, No. 204, § 1, and Article 1536 became La.Civ.Code art. 1541, which removes the no-exception concept and states: "A donation inter vivos shall be made by authentic act under the penalty of absolute nullity, *unless otherwise expressly permitted by law*." La.Civ.Code art. 1541 (emphasis added). While earlier decisions following the 1981 case of *Succession of Miller* reference manual delivery as the "only exception" to the notarial act requirement, and even recent cases have parroted the notion, the revision comments of 2008 state otherwise: "Donations of both immovable and movable property must be made by notarial act unless a particular exception applies. There are *numerous exceptions* to this Article including Article 1543 (manual gift) and Article 1550 (stock certificates and negotiable instruments)." La.Civ.Code art. 1541, Comment (b), Revision Comments–2008 (emphasis added).

However, stock certificates and negotiable instruments are only two examples of gifts addressed in Article 1550, and it does not limit its application to only stock certificates and negotiable instruments. This is apparent in the first paragraph discussing certificates, documents, instruments *or* other writings. And it is apparent in Revision Comment (c) addressing checks and promissory notes, "whether negotiable or non-negotiable," that are governed by Chapter 9 of Louisiana's Uniform Commercial Code–Secured Transactions.

It is true that *Gassiott* and *Harrison*, discussed above, both involved donees who converted the funds to either cash by withdrawal (*Gassiott*) or to a sole

22

account of her own (*Harrison*) before the death of the donor.  However, neither of those cases involved the power of attorney by authentic act that facilitated the donation to Rebecca in this case.  The evidence of James Love's intent was strong and convincing that he wanted Rebecca to have the funds in the accounts, and he did everything he thought he should do in his remaining weeks.  Rebecca testified that when James executed the power of attorney in her favor, four weeks before he died, he asked the attorney whether there was anything else he needed to do, and the response was "no."  James wanted to die in peace, knowing that his affairs were in order.  Under Article 1550, the rights to the deposit accounts were transferred to and accepted by Rebecca when she endorsed the signature cards and bank documents always required for that particular kind of incorporeal movable.

Under revised La.Civ.Code art. 1551, "[a] donation is effective upon acceptance.  When the donation is effective, the ownership or other real right in the thing given is transferred to the donee."  La.Civ.Code art. 1551.  "Under this Article delivery is not required if the acceptance is made by a means other than corporeal possession."  *Id*. at Revision Comment (b).  Under La.Civ.Code art. 2481, entitled *Incorporeals, method of making delivery*:  "Delivery of incorporeal movable things incorporated into an instrument, such as stocks and bonds, takes place by negotiating such instrument to the buyer.  Delivery of other incorporeal movables, such as credit rights, takes place upon the transfer of those movables."  Thus, Rebecca's acceptance of the accounts by endorsement of the bank's documents also satisfies Articles 1550, 1551, and 2481.

V.

## **<u>CONCLUSION</u>**

Based upon the foregoing, the judgment of the trial court in favor of Rebecca Tisdale Love is affirmed. Costs of this appeal are assessed to the Succession represented by Manor Love Sr.

**AFFIRMED**.