DREW, J.
| í Laura Eikert Bailey, Tracy Eikert O’Quin, and Paul J. Eikert (“the Eikert children”) appeal from two judgments denying their motions to traverse the descriptive list for the estate of their father, Martin Paul Eikert. For the following reasons, we affirm.
The issue in this case is whether the trial court erred in finding that two transfers of funds from the separate property of Martin Eikert to the separate property of Eikert’s third wife, Ann Kelly Eikert, were valid donations.
Martin Eikert was a resident of Bastrop, Louisiana; his working career was spent doing forestry with International Paper (“IP”). He was married three times. During his first marriage, to Rae Eikert, he had three children: Laura, Tracy, and Paul. Martin was married to his third wife, Ann Kelly Eikert, for approximately 17 years prior to his death in 2013. At the *864 time of Martin’s death, Ann was employed as a registered nurse; Martin was retired.
Martin and Ann had a separate property regime, although they kept a joint checking account at Kaufman Credit Union (“Kaufman”) to pay household expenses. Martin had a substantial separate property estate that included the house in Bastrop where he and Ann lived, almost half a million dollars in a tax-deferred retirement account held at JP Morgan Chase,[1] and about $250,000 in cash that he kept at Kaufman in a savings account. In March 2003, Martin executed a will leaving his home to Ann and “the balance of my estate” to his three children.
|2For at least the last year of his life, Martin suffered from severe COPD. According to Paul, Martin required oxygen 24 hours a day, had great difficulty in speaking, was unable to drive and was only able to walk short distances. On January 12, 2013, Martin was admitted to the intensive care unit at Glenwood Regional Medical Center because of complications from his condition.
On January 18, 2013, while Martin was in the hospital, there were several transactions in the Eikerts’ accounts at Kaufman. First, $26,208.89 was moved from Martin’s separate account into Martin and Ann’s joint account, leaving a balance of $225,005 in Martin’s separate account. The Kaufman employee who performed the transfer, Barbara Andrews, did not know Martin and did not know that Martin was in the hospital at the time. Kaufman had no written record concerning who requested the transfer. However, Ms. Andrews explained that transfers of money between Kaufman accounts were commonly done by phone. Ms. Andrews had no independent memory of the transaction but believed that the request must have been made by telephone, Although some of the Kaufman tellers had “signature pads” that allowed them to write “phone” for telephone transfers,[2] Ms, Andrews’ computer was not so equipped.
The cell phone records from Martin and Ann’s phones do not show any call to the bank around the time of this transaction. Paul testified that there was no phone in the intensive care unit where Martin was hospitalized, but Ann said “as well as I can recall, yes, there was a phone there.”
|sMs. Andrews said that even though she did not remember the call, she would not have performed the transfer from Mr. Ei-kert’s account unless she had satisfied herself that the person on the phone was indeed Martin Eikert. She also said that if someone other than Martin had physically come into the bank and requested the transfer, she would not have done the transaction. Paul Eikert testified that had Martin been able to use the phone, he would have been gasping for breath because of his condition on this date, and the Eikert children offered a physician’s impression of what Martin would have sounded like had he used the phone.
Four hours later on January 18, 2013, $26,208.89 was moved from the Eikerts’ joint account into Ann Eikert’s separate Kaufman account. The bank had no written record of who requested this transfer, and Cynthia Bowe, the Kaufman employee who performed the transfer, said that she had no independent memory of who requested the transfer; she did not remember speaking with either Martin or Ann, *865 Ms. Bowe said that either Martin or Ann Eikert had the authority to request the transfer as this was a joint account.
Finally, also on January 18, 2013, a certificate of deposit was created at Kaufman in the amount of $225,000. That CD, in Martin’s name, specified that upon Martin’s death, the money would go to the Eikert children, not to Ann Eikert. Ms. Andrews explained that only Martin could have authorized the creation of the CD and the transfer of money out of his account. The creation of the CD left $5 in Martin’s separate account.
Ann Eikert testified that she did not see Martin make a call to Kaufman related to the January 18 transfer, but she said that Martin “would have had to make a phone call” because “I couldn’t have done it.” She also | ,(Said that she understood that Martin called Kaufman “several times that day.”
Ann had no memory of making contact with Kaufman employees regarding the January 18 transfers. Ann explained that Martin told her that “he did want me to have a portion of ... part of the money” and that Martin told her that he was giving her the funds “because he wanted me to have it.” Ann said that Martin told her “I talked to the credit union and told them my wishes.” She testified:
Q: So your position is that you had no participation whatsoever prior to learning of the call—your position of Mr. Eikert making a phone call to the credit union, you had no participation with the credit union employees with regard to the transfer—
A: In January.
Q:—on January 18th that those funds, how they got in your separate savings account?
A: No.
Martin was discharged from the ICU on January 21, 2013, and moved into a skilled care unit. Beginning on February 4, 2013, Martin and Ann had several discussions with JP Morgan Chase about how to handle Martin’s 401(k). There are notes and recordings from these calls. During the first call, initiated by Ann, the bank representative confirmed with Martin that Ann had permission to speak with the bank, and Ann told JP Morgan Chase that Martin wanted to roll his IRA over to a local credit union. On February 5, 2013, Ann called JP Morgan Chase again, and Martin also spoke with the representative, saying that he wanted to roll the money into an IRA and start taking money out. The notes from this call state:
Mr. Eikert said what he is trying to do is leave that money to the children[.]
|sThe notes also indicate that Martin was speaking with difficulty. The bank employee informed the Eikerts that Martin had to make a required minimum distribution of $18,207.17, and Martin decided to have 10% of that withheld for federal taxes. On February 6, 2013, Ann called back again, and after confirming with Martin that Ann had the right to speak with the bank employee, Ann went ahead with the rollover, instructing JP Morgan Chase to perform the transfer. JP Morgan Chase sent three[3] checks to the Eikerts by postal mail.
Martin Eikert was discharged from the skilled care unit on February 11, 2013, and *866 went back to live at his home with Ann. Ann testified that while Martin was home, he reviewed his credit union statement dated January 31, 2013. None of the witnesses reported that Martin made any complaint about the handling of the January 2013 Kaufman transactions.
After the JP Morgan Chase checks arrived, Martin endorsed all three in blank and Ann delivered them to Kaufman on February 15, 2013. Kauftnan employee Cynthia Bowe testified about how the checks were handled. Ms. Bowe said that she had been employed with Kaufman for 30 years, and had dealt with Martin Eikert as a customer for 18 years. She was familiar with his voice and “waited on him over the phone many times.” Ms. Bowe said that she spoke with Martin Eikert on the telephone on either February 14 or February 15, 2013, for a few minutes and wrote down his instructions about what to do with the JP Morgan Chase checks. Bowe said Ifithat Martin told her the amounts of the checks, told her to put the large check into an IRA and, for the two smaller checks:
He instructed me to deposit that into checking and then transfer—deposit a certain amount and then transfer the rest to Mr. [sic] Eikert’s checking.
Although the transcript says that the witness testified that Martin said to put the money into “Mr. Eikert’s checking,” the remainder of the witness’ extensive testimony shows that Bowe meant that Martin instructed her to put the money into Ann Eikert’s separate account, not Martin’s separate account. As Bowe later explained:
Q: Who told you how much to transfer to her [Ann Eikert’s] separate account?
A: Mr. Eikert.
Bowe said that Martin sounded “sick,” and she responded “possibly” when asked if he appeared to be gasping for air. Ms. Bowe followed Mr. Eikert’s instructions, depositing the two smaller checks into the couple’s joint checking account and then transferring $27,148.99 into Ann’s separate account, leaving an even $1,500 in the joint checking account. Bowe explained that, although she wrote down Mr. Eikert’s instructions when he gave them to her, she shredded the note containing the instructions at the end of the day per her usual practice. Bowe said that Ann did not give her any instructions about what to do with the funds; the only instructions came from Martin Eikert, and Ann likewise testified that she did not direct how the funds were deposited.
Bowe testified that once the checks were in the joint account, Ann would have had the authority to move the money into her separate account, but she did not do so; the money was moved at Mr. Eikert’s instruction. |7Notably, the form associated with the- creation of the IRA listed the beneficiaries of that money as the Eikert children, not Ann Eikert, and Bowe explained that Ann could have added her name as a beneficiary but did not do so. Bowe further explained that although the smaller checks were endorsed in blank, it was Kaufman’s policy not to allow the deposit of such cheeks into the separate account of a person who is not listed as the payee on the check, so Ann could not have deposited the checks into her own account directly.
Martin returned to the hospital on February 18, 2013, and he passed away there on March 3, 2013. Friction between the Eikert children and Ann led to two motions to traverse the descriptive list furnished to the court by Ann, as that descriptive list did not include either of the cash transfers from the joint checking account into Anris separate account. The Eikert children argued that neither of these transfers was a valid donation from *867 Martin to Ann. The trial court heard these motions in two hearings, with the February transfer heard first, and decided them in two judgments. The trial court proceedings were concluded when the court decided the second motion with a final judgment signed on November 30, 2015. The trial court supplied extensive reasons for the second judgment regarding the January transfers, some of which we reproduce here:
The children dispute that in January, these actions could have taken place in the manner advanced by Mrs. Eikert. They contend that Mr. Eikert could not have called and instructed the credit union in January from his ICU hospital room because he was physically unable to talk without difficulty. Inasmuch as the credit union employees could not specifically recall talking to Mr. Eikert in January, the children suggest that a man gasping for air, as Mr. Eikert’s physician suggested he would have been, would have left a rather indelible memory impression on the bank personnel. They also point out that an examination of the telephone records for those accounts which belong to Mr. and Mrs. Eikert disclosed no evidence that any calls are made | ¿to the credit union from those phones. Mr. Eikert’s son testified that there were no phones in the ICU. The Eikert children suggest that the credit union employees simply followed the instructions of Mrs. Eikert and suggest that no such call from Mr. Eikert to the credit union ever took place.
The children also suggest that there is every reason to believe that Mr. Eikert had no intention to donate separate funds to Mrs. Eikert. His last will and testament gave the family home to Mrs. Eikert and she was to receive his pension benefits. The remainder of his property, he had made clear, was to go to his children. Mr. Eikert’s actions in “donating” these funds to his wife, by transfer of separate funds to her separate accounts, his children contend, are inconsistent with his oft-stated intentions, casting considerable doubt on whether or not a donation actually occurred.
The evidence adduced at the several hearings in this case does not create considerable doubt in the court’s mind. Indeed, it appears that the ailing Mr. Eikert was preparing his affairs for the worst. The January 18, 2013, transactions show that he invested the overwhelming amount of his separate savings on deposit in the credit union by placing a dollar amount, in even round dollar numbers ($225,000.00), into another interest bearing savings vehicle which ensured that his children would receive the benefit upon his death. A token amount ($5.00) was left in the savings account and the remainder ($26,208.89) was ultimately transferred to ... Mrs. Eikert’s separate account.
The children suggest that Mrs. Eikert bears the burden of proving that the separate funds of Mr. Eikert that were ultimately deposited into her account were donated to her by Mr. Eikert by “strong and convincing” evidence, a burden presumably significantly higher than that of “more probable than not.” This Court is of the opinion that the “more probable than not” burden has been easily carried. And, after the Court considers the consistency of Mr. Eikert’s alleged actions; the fact that he converted the overwhelming bulk of his liquid assets into safe vehicles for his children; the fact he had the opportunity to review his credit union statements before he ultimately died to verify any instructions that he had given; the fact that the credit union employees testified that their practices and procedures were to not act unless they were sure that they *868 had received their instructions from the authorized account holder; the fact that Mr. Eikert, in connection with the February IRA transfer, reviewed and signed the IRA beneficiary designation that the credit union had returned to his home, convinces this court that the evidence ... supports a finding that Mr. Eikert donated the disputed sums to Mrs. Ei-kert is established by strong and convincing evidence. The fact that phone records cannot be located to support the fact of the alleged telephone calls from Mr. Eikert to the credit union is a detail which does not significantly detract from the considerable body of evidence in support of the donation.
I ¡/Therefore this court makes the factual finding that the complained of transactions, i.e., the disputed transfers of Mr. Eikert’s separate funds into the separate account of Mrs. Eikert, do constitute manual gifts or donations to Mrs. Eikert before Mr. Eikert’s death.
The Eikert children now appeal from the denials of their motions to traverse.
DISCUSSION
On appeal, the Eikert children’s two assignments of error are:
1. Did the trial court commit legal error and/or manifest error in concluding that the January 18, 2013, transfer of $26,208.89 was a donation to Mrs. Ei-kert?
2. Did the trial court commit legal error and/or manifest error in concluding that the February 15, 2013, transfer of $27,148.99 was a donation to Mrs. Eikert?
Appellants point out on appeal that there was confusion at trial regarding who had the burden of proof. Although the record reflects that the court discussed that issue with the parties during the proceeding, the record also shows that the court ultimately applied the correct burden.
This matter was instituted as a traversal by appellants of the descriptive list filed by Ann Eikert. La. C.C.P. art. 3137 provides:
The descriptive list of succession property authorized by Article 3136 shall be accepted as prima facie proof of all matters shown therein, unless amended or traversed successfully.
The court may amend the descriptive list at any time to correct errors therein, on ex parte motion of the person filing it. Any interested person may traverse the descriptive list at any time, on contradictory motion served on the person filing it. If a descriptive list is amended, or successfully traversed a copy of the amended or traversed descriptive list shall be filed with the Department of Revenue. The court may order the reduction or increase of the security required of a succession representative to conform to the corrected total value of the property of the succession.
Appellants argue, and we agree, that to the extent they had any burden of proof in this case, they met that burden by proving that Ann’s descriptive list |inwas inaccurate. Appellants showed that Ann did not include on the list, among other things, the couple’s joint Kaufman account.
A donation inter vivos is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it. La. C.C. art. 1468.
The primary question here was whether the transfers from Martin’s separate savings and retirement accounts were valid donations, and the burden of proving that the donations were valid fell to Ann. Proof of Martin’s intent to donate is the heart of *869 this issue, but we also discuss whether the donations were valid in form.
Donative intent is a factual issue and is reviewed on appeal under the manifest error standard of review. Thomson v. Thomson, 34,353 (La.App. 2 Cir. 1/24/01), 778 So.2d 736. If a trial court’s findings are reasonable based upon the entire record and evidence, an appellate court may not reverse even if it is convinced that had it been sitting as trier of fact it would have weighed the evidence differently. Housley v. Cerise, 579 So.2d 973 (La. 1991). As the supreme court explained in the context of a manual gift in Succession of Woolfolk, 225 La. 1, 71 So.2d 861 (1954):
By the terms of Article 1539 of the LSA-C.C., “The manual gift, that is, the giving of corporal movable effects, accompanied by real delivery, is not subject to any formality.” This article does not dispense, however, with the necessity of proof of intention on the part of the donor to give. There is an old Latin maxim in law which reads: “Nemo pre-sumitur donare”, i.e., “No one is presumed to give.” This is but another way of stating that the burden of proving the donation is on the donee, and under the decisions of this Court, the proof to support the donation must be strong and convincing.
We conclude that the January 2013 transfer of funds from Martin’s separate account into the couple’s joint account is best categorized as a Indonation of an account on deposit. Such accounts are incorporeal movables. La. C.C. art. 473. The characterization of the two JP Morgan Chase distribution checks is murkier,[4] but because of the way the checks were actually handled by Ann and by Kaufman, we will treat those funds the same way for purposes of this discussion under these particular facts.
Donation of corporeal movables may be accomplished by manual delivery, La. C.C. art. 1543, but the donation of an incorporeal movable is governed by La. C.C. art. 1541, which provides:
A donation inter vivos shall be made by authentic act under the penalty of absolute nullity, unless otherwise expressly permitted by law.
The authentic act requirement is subject to several exceptions. See Comment (b) to La. C.C. art. 1541. La. C.C. art. 1550 provides:
The donation or the acceptance of a donation of an incorporeal movable of the kind that is evidenced by a certificate, document, instrument, or other writing, and that is transferable by endorsement or delivery, may be made by authentic act or by compliance with the requirements otherwise applicable to the transfer of that particular kind of incorporeal movable.
In addition, an incoiporeal movable that is investment property, as that term is defined in Chapter 9 of the Louisiana Commercial Laws, may also be donated by a writing signed by the donor that evidences donative intent and directs the transfer of the property to the donee or his account or for his benefit. Completion of the transfer to the donee or his account or for his benefit shall constitute acceptance of the donation.
This article has been applied several times in recent jurisprudence to cases involving donations of bank accounts. The Third Circuit, in In re Succession of Gassiott, 2014-1019 (La.App. 3 Cir. 2/4/15), 159 So.3d 521, writ denied, 2015-0493 (La. 5/15/15), 170 So.3d 968, found a donation 112of funds to a surviving wife to be in proper form and *870 complete where the husband had (1) placed separate funds into a joint checking account coupled with (2) donative intent. See this Court’s discussion of that case in In re Succession of Harrison, 50,258 (La.App. 2 Cir. 11/18/15), 183 So.3d 579; see also In re Succession of Love, 16-245 (La.App. 3 Cir. 9/28/16), 201 So.3d 1027. We conclude in this case that, if strong and convincing evidence of donative intent is proven, there are no formal impediments to recognizing these transfers as donations.
The trial court’s finding of donative intent for both transactions was informed by the reverse chronological order in which these motions to traverse were tried. For the February 2013 transfer, the court had an abundance of evidence from which it could infer that Martin intended to donate the IRA distribution proceeds to Ann. Specifically, the testimony of Cynthia Bowe was that:
• Martin called her before Ann delivered the JP Morgan Chase checks to the bank;
• Martin told her to create an IRA with the largest check for the benefit of the Eikert children;
• Martin instructed her to deposit the two smaller checks into the couple’s joint checking account;
• Martin specifically told Bowe to move all but $1,500 from the joint account into Ann’s separate account; and
• Ann did not tell Bowe what to do with the checks, and Kaufman’s policy would not have allowed Ann to deposit these checks directly into Ann’s separate account.
We are mindful that the record also contains evidence that tends to undermine the trial court’s reliance upon this testimony, including:
• Martin’s will leaving the bulk of his estate to the Eikert children, not to Ann;
| ia* Martin’s statement to the JP Morgan Chase rep that what he was “trying to do is leave that money to the children”; and
• The absence of written proof of Martin’s wishes, even in the form of the contemporaneous notes Ms. Bowe made for herself.
Nevertheless, the trial judge, who had the benefit of hearing Ms. Bowe testify live, concluded that Martin’s donative intent was plain from his actions. Bowe’s testimony, if believed, was ample evidence to satisfy Ann Eikert’s burden of proving Martin’s donative intent for the February transfer.
Because the motions to traverse were tried in reverse chronological order, the trial court had the benefit of considering the testimony about the February transfer when deciding the proof of intent for the January transfer. Characterizing that transfer as a donation is more problematic due to the complete absence of either contemporaneous records or even the memory of any Kaufman employee about these events. We know:
• Martin had slightly over $250,000 in cash in a separate savings account at Kaufman;
• On January 18, 2013, Martin was in intensive care in very poor health with limited ability to speak and, possibly, limited access to a telephone;
• Cell phone records do not show calls to the bank from Martin or Ann;
• That day, Kaufman employees created a certificate of deposit for $225,000 with the Eikert children named as beneficiaries;
• Martin signed paperwork accompanying the creation of this CD;
*871 • Also that same day, almost all the rest of Martin’s separate money was moved into the joint checking account he shared with Ann;
• Several hours later, that money was moved into Ann’s separate account;
• These transactions were reflected on Martin’s January 31, 2013, credit union statement;
114* Martin had the opportunity to review this credit union statement before his death, and Ann said that he did look at it, and Martin did not complain about the handling of the transactions;
• Credit union employees emphatically stated that they would not have moved money out of Marvin’s separate account via a phone conversation unless they were convinced that they were speaking with Martin; and
• Ann testified that she did not participate in moving the money into her separate account, but said that Martin called the credit union outside of her presence and then told her what he had done.
Although a fact-finder should always closely scrutinize the self-serving testimony of a putative donee, the record as a whole here does not show that the trial court’s choice to credit Ann Eikert’s testimony was manifestly erroneous or clearly wrong. The informal way that the Eikerts’ credit union handled phone transfers for longtime customers meant that there were essentially no contemporaneous records that might prove or disprove Martin’s intent to donate the money to Ann in January. However, as the trial court recognized, Martin was clearly “preparing his affairs for the worst.” The judge was reasonable to accept the testimony of the credit union employee who testified that she would not have moved the money out of 11BMartin’s separate account unless she was convinced she was dealing with Martin himself. Further, the overall character of this transaction is not suspicious; Martin transferred 9/10 of his cash savings into a CD for his children and, according to Ann, his wife of 17 years, Martin decided to give the remaining 1/10 to her. The evidence proving that the Februaiy transactions were donations supports the trial court’s conclusion that the January transaction was also a donation.
Further, we believe that the key in this series of events is the essential impossibility that Ann could have, by herself, moved the money out of Martin’s separate account. That act, by Martin, placed the money within Ann’s control,[5] and thus was a donation to her, so we do not believe that the subsequent movement of the money into Ann’s separate account is a separate act where donative intent must be proven a second time. However, the trial court chose to believe the testimony of Ann that Martin, not herself, performed this second transfer, so the record supports the conclusion that the second transfer was also a donation. The movement of the money into Ann’s separate account was certainly evidence that the donation was completed; again, see Succession of Gassiott, supra. Thus Ann satisfied her burden of proof that the January transaction was a donation.
Because there was no manifest error in the trial court’s decision to accept the testimony of Ann Eikert and the credit union employees, and because cumulatively this evidence met Ann Eikert’s burden of proving donative intent by strong and convinc *872 ing evidence, we affirm the decision of the trial court at appellants’ cost.
AFFIRMED.

, When Martin and Ann married, Ann signed a form waiving any interest in this account in favor of the Eikert children.

. Martin had made other transfers by telephone in the past, and at least some of them had the “phone” notation in the Kaufman records.

. Nothing in the record explains why JP Morgan Chase sent three checks to the Eikerts. The largest check, about $470,000, was made payable to Kaufman for the rollover, but the other two checks for $17,749.60 and $11,169.39 were made payable to Martin. The sum of the two smaller checks exceeds the amount of the required minimum distribution discussed during the phone calls. Because the smaller checks were payable to Martin and not rolled over into the new IRA, they are effectively distributions.

. He endorsed the checks in blank and gave them to Ann. See, e,g„ La. R.S. 10:3-203(e).

. Ann was the only other signatory on the joint account, see Succession of Gassiott, supra.