# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 23-61

## IN RE SUCCESSION OF BARBARA DUMENSIL REGGIE

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, 2019-20217-E
HONORABLE MICHELLE M. BREAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## LEDRICKA J. THIERRY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Gary J. Ortego, Ledricka J. Thierry, and Guy E. Bradberry, Judges.


AFFIRMED.

Clint M. Bischoff
320 Duson Avenue
P.O. Box 530
Iota, LA 70543
(337) 779-3661
COUNSEL FOR PLAINTIFF/APPELLANT
Barbara Reggie Hornsby

Alan K. Breaud
Timothy W. Basden
Breaud & Meyers
P.O. Box 51365
Lafayette, LA 70505
(337) 266-2200
COUNSEL FOR DEFENDANT/APPELLEE
Gregory F. Reggie, Sr., Exceutor of the Estate
of Barbara Dumensil Reggie

John F. Craton
Barousse & Craton
P.O. Box 1305
Crowley, LA 70527
(337) 785-1000
COUNSEL FOR DEFENDANT/APPELLEE
Gregory F. Reggie, Sr., Exceutor of the Estate
of Barbara Dumensil Reggie

**THIERRY, Judge.**

A legatee, Barbara Reggie Hornsby, appeals a judgment of possession concerning her deceased mother's estate, asserting that the extrajudicial partition was invalid. For the reasons that follow, we affirm the trial court's ruling and entering of the judgment of possession.

## FACTS AND PROCEDURAL HISTORY

This appeal arises out of the succession proceedings of Barbara Dumensil Reggie ("Decedent"), a resident of Crowley, Louisiana, who died testate on October 18, 2019. At the time of her death, Decedent had eight children, six of whom were living. In her testament, Decedent left her estate in undivided equal parts to her surviving children and successors of her predeceased children. The total value of the estate was determined to be $1,138,867.10. Decedent's testament appointed Gregory F. Reggie, Sr. ("Mr. Reggie"), Decedent's nephew and also a local attorney, as executor without independent administration. Mr. Reggie was appointed executor by order of the trial court on November 14, 2019.

Mr. Reggie, as executor, took charge in dividing Decedent's assets. The assets included one piece of immovable property (Decedent's home), many household property items, and monetary accounts and investments. The movables, including furnishings, guns, jewelry, and other household items, were valued at approximately $63,845.00.

On November 22, 2019, Mr. Reggie emailed the heirs to provide an update regarding Decedent's estate. He specifically addressed the household movable items (emphasis in original):

> **Contents of the Home**
> I am devising a process to address the inventory, valuation and distribution of the contents of the home to you, including art, rugs,

jewelry, china/crystal, furniture, etc. and will advise you about that soon. I am also looking into options for disposing of what may be left that no one claims. I will write you all again shortly in a different email to address a few questions on the contents of the home.

A few minutes later on that same date, November 22, 2019, Mr. Reggie sent a follow-up email regarding the contents of the home (emphasis in original):

A little later, once I have obtained values on the contents of the house (as much as practical) and then share them with you, I plan to follow up with you to ask what items you may want as a priority. It is possible that others may not want that item and it can easily be directed to you. If more than one person wants an item, we can deal with that as needed in a fair process. Whatever items are distributed to you either way, it seems fair as I write this that we will count that item's value as a part of your share of the contents being distributed.

On November 30, 2019, Mr. Reggie issued a partial distribution of cash to the heirs, including to Barbara Reggie Hornsby ("Ms. Hornsby), the Appellant in this matter, and daughter and heir of Decedent. Ms. Hornsby received a cash distribution of $46,868.77, to which she did not object.

On December 1, 2019, Ms. Hornsby emailed Mr. Reggie a list of "[t]hings Moma [Decedent] said she wanted me to have." The list included her deceased parents' wedding rings, a bracelet and coin from Mexico, her mother's bird bath, scapulars, the table in the foyer, the China cabinet in the den, a round table with four chairs, a twist bracket from Lebanon, the patio furniture, her parents' bedroom furniture set, any holy statues and relics, and the freezers. These items were not bequeathed to Ms. Hornsby in the testament, and there is nothing in the record to indicate Decedent wished to leave those items to Ms. Hornsby.

On January 12, 2020, Mr. Reggie created a partition process of the movable items within Decedent's home and shared it with the heirs via email. That email states, in relevant part:

Once all of the valuations [of the household, movable property] are completed I will email you a spreadsheet listing everything with values for you to determine what may interest you. I will also send pictures of all of the jewelry. Everyone will have an overall "budget" to make their selections, based on their percentage interests in the total value of all items—in the same percentages as the previous cash distribution. It will all be spelled out again before you select, but as an example, if the total value of all personal items being distributed is $50,000 and you have a 12.5% interest, your budget will be $6,250. If you don't select enough items (value) to use up your budget, you will get the remainder in cash at distribution time. If you select more than your budget, as long as no one else selects the same things, you can have those "over budget" items and receive less cash distribution in the end. I hope everyone will be able to get the items most important and useful to them, and if more than one person wants the same item, we can always allow you to "bid it up" until someone gets it. Friendly bidding, of course. Once finally decided, you will be asked to take away all of your items quickly, and by a certain date, so we can put the house on the market.

. . . .

In the end, any items not selected will be given away—to you, or to charity, or tossed out. We will try to use as little money as possible to dispose of unclaimed items.

All heirs, including Ms. Hornsby, agreed to the terms of this email, namely that each heir would be allowed to select any desired movable property items and place a bid on such items, with a starting value set by Mr. Reggie and agreed upon by the heirs. If no competing bid was placed by another heir, then the heir who made the bid would be credited with purchasing the item, and the amount would be deducted from the heir's share of the succession property. If multiple heirs bid on the same item and were not "over budget," then they could engage in "friendly bidding." Ms. Hornsby does not dispute that she agreed to the terms set forth in the January 12, 2020 email.

The heirs then began placing bids on the items within decedent's home. Ms. Hornsby made her bids on February 8, 2020, and ultimately selected about 150 items, totaling around $32,000.00 in value. Several of the items that she bid on were

3

also bid on by other siblings. Following her bidding, Mr. Reggie emailed Ms. Hornsby on February 9, 2020, and requested that she email him her top picks. The subject line of the email is entitled "I need your top picks," and the body of the email states (emphasis in original):

Babs,

Thanks for pulling through yesterday. I know it's tough but we got it done.

A little follow-up now that everyone has selected. Long story short, I will need you to prioritize your picks. As you will recall, everyone has a budget proportional to their ownership interest. It's 12.5% (1/8th each for you and your sib[ling]s) of the value of the personal property, so about $8,300/person.

Your selections totaled a little over $32,000 (not counting the "left over" jewelry you want but did not select as a priority) covering many, many items. And that is a good thing and I think you will be able to get most of it. But right now your existing selections overlap with 25 selections of other family members. Other than those 25 overlaps, there are only another 7 overlaps in total. So we need to solve this together quickly.

**The solution is for you to take the spreadsheet I sent you after our walkthrough and pick the $8300 in items that will be your "official selections."** That will put you in the same situation as the others who selected closer to the budgeted amount. If there is a conflict with your "official selections" and those of others' "official selection[s]" we will work that out. For the items that are not in your "official selection" but are in someone else's "official selection" they will get the item—just as you will get the items in your "official selection" tha[t] no one else has selected. There are many, many items you selected that do not overlap with anyone else and at the end of this process you will get all of those extra selections automatically. Please get me your "official selections" tomorrow (Monday) so we can resolve the remaining overlaps and wrap up this phase of the process, keeping us on schedule to get everyone their property and have it removed from the house so we can sell the house. Thanks for helping to work through this.

With much love,

Gregory

Ms. Hornsby replied to Mr. Reggie's email above, saying "[t]his is my list," followed by several household items and pieces of jewelry indicated by bidding number. Mr. Reggie replied to that email later that same day, stating:

Babs,

Thanks for your cooperation in getting us to this point. The selections have all been made and I am sorting them out. Here is how yours comes out.

You will get your selected items in the attached spreadsheet marked in light green, **except** not what is marked in red (someone else picked it as their first choice and it wasn't in your first choice category so it will be theirs) and not what is marked in orange (yet) because it overlaps with someone else's first choice. If someone who has a conflict goes to a second round of picking to make up for an overlap, and they pick something in your secondary selections, then it will be a "tie" and we will bid on those items or select other things. But we'll cross that bridge if we come to it.

1. FOYER: You picked the whole 4 shelf curio cabinet. Someone else picked only the "tea cups and ballerina" and "pair of dancing figurines" in the cabinet. Do you want to let them take those or do you want me to set up a bid—or some other process?
2. MASTER BEDROOM: You and someone else picked the pair of 3 drawer night stands. You and someone else picked the lingerie cabinet and dresser with single mirror. Do you want to [sic] me to set up bidding or do you want to pick something else? I am writing the others this same paragraph at the same time as you.
3. JEWELRY: There is overlap on the several pieces you selected. Would you like to pick again or bid for these pieces[?] I can create a list of what is still available after all selections are tallied once I sort all of this out.

I think that's it. Once we clear the overlapping selections you will have a lot of fantastic family heirlooms.

Please let me know how you want to proceed on the items above. Lots of love,

Gregory

P.S. I'm asking in advance that if I have made any inadvertent errors (I hope not), please work with me to get them corrected. This has been quite complex.

Ms. Hornsby replied to that email on February 14, 2020, saying: "Was at a meeting last night. Who wants mother's and dad[']s rings." Mr. Reggie did not reveal who wanted the wedding rings, as all heirs agreed that the bidding process would be confidential.

On February 16, 2020, Mr. Reggie emailed the heirs regarding the remaining items and explained round two of the bidding process. He noted that "[a]t this point everyone has gotten a chance to select what they want in round one." He explained that he was "**slashing everything [besides the jewelry] to half-price**" to be chosen in the next round of selections (emphasis in original). On February 18, 2020, Mr. Reggie emailed Ms. Hornsby individually regarding her bids on the jewelry items, writing:

> Babs,
>
> I earlier forwarded you bids on the overlapped jewelry that you and others have selected in round one; specifically on jewelry items number 118, 129 and 178. I have not heard back from you. If I do not hear from you by the end of the day tomorrow, Wednesday, I will assume that you do not want to bid and will let them go. The other person for item 177 has dropped out so that item is yours. Thanks and lots of love.

Seven minutes later after Mr. Reggie sent the above email, Ms. Hornsby replied "I am pulling my bid on all items." Mr. Reggie replied, "OK, thanks for letting me know. Lots of love always." When asked at trial what she meant by that email, Ms. Hornsby said: "I mean, I was pulling out of the bidding process. I was pulling my bids because I wanted to get with an attorney. I mean, he told me I couldn't have what I originally picked." On the other hand, Mr. Reggie interpreted Ms. Hornsby's statement of "I am pulling my bid on all items" in its literal sense, i.e., that Ms. Hornsby simply wished to remove her bids and opt for the cash value

of her $8,300.00 share of movable property instead. He did not believe that she wished to withdraw from the bidding process entirely.

Accordingly, Mr. Reggie continued to move forward with the bidding process.

On February 20, 2020, Mr. Reggie emailed Ms. Hornsby the following:

> Babs,
>
> Please let me know when you can pick up your items at the house. We are trying to close it out for sale of the house.
>
> FOYER: curio cabinet and contents;
> DEN: round table with crocheted table cloth, curved glass china cabinet;
> YVONNE-BARBARA ROOM: king bed;
> JEWELRY: #s 7, 19, 24, 63, 109, 121, 170, 177, 180, 220, 240, and 242 and/or 243 (I think one is your Mexico cross?). The jewelry is at my house for safekeeping.
>
> Please let me know if I missed anything or made any errors in selections above. We are in the home stretch.
>
> Also, please get me any Round 3 picks you may have by the end of the day tomorrow—Friday. Thanks!
>
> Lots of love,
>
> Gregory

On February 22, 2020, after failing to receive a response from Ms. Hornsby, Mr. Reggie again emailed Ms. Hornsby to check in:

> Barbara, I still haven't heard from you and we are trying to move the process along. I don't know where you stand in this anymore. Whatever you want is fine with me, but I would appreciate your letting me know since I'm trying to do this in the proper fashion. Please get back to me and let me know what you want to do. Thank you.

Finally, on February 22, 2020, Ms. Hornsby replied to Mr. Reggie and said:

> I was advised by my attorney not to speak with anyone until I meet with him. He wants both dad and mom[']s will, succession and all appraisals on home furnishings for 660 West 17th st. and jewelry. Also, he wants a copy of the house appraisal, and all correspondence between us.

Mr. Reggie sent Ms. Hornsby two emails on February 22, 2020, attaching the requested jewelry valuations by Buttross Jewelers and letting her know that the home appraisal and values of home furnishings were previously sent to her.

On February 27, 2020, Mr. Reggie again contacted Ms. Hornsby via email:

Babs,

I hope that by now you have had a chance to speak to your attorney and can let me know if and when you will be picking up the items you originally selected in Round 1, or if you are sticking by your email stating that you are pulling your bids on all items. I need to move the process along and plan to do so but want to give you the chance again to get these items before I let them go to others. You will recall that the items you take (or don't take) are accounted for by deducting (or not) the stated value of the items from future cash distributions. If I don't hear from you I will assume you want the cash instead of the items, as explained at the beginning of the process, and will move forward on that basis. Love,

Gregory

On February 28, 2020, Mr. Reggie emailed Ms. Hornsby, asking if Aaron III (Ms. Hornsby's son) could bring her the items she originally selected. She replied to his email and said: "I have Clint Bishoff as my attorney and he will [be] handling this for me."

On March 18, 2020, two of the heirs held a garage sale of some of the household movable property items they received from Decedent's estate. The value of those items were subtracted from their respective $8,300.00 shares.

On February 21, 2020, counsel for Gregory F. Reggie Sr. filed a Petition for Authority by Executor to Sell Immovable Property at Private Sale, in which he stated that he received an offer by a buyer to purchase the home of Barbara Dumensil Reggie for $330,000.00. He asked the Court for authority to sell the property for that amount. On April 2, 2020, the district judge in Acadia Parish signed a judgment that gave Gregory F. Reggie, Sr. permission to sell the decedent's home for $330,000.00.

8

Barbara Hornsby expressed intermittent interest in purchasing the home, but could not afford the price. The house was sold to the buyers with court approval.

On May 14, 2020, Mr. Reggie made a second cash distribution to the heirs. Ms. Hornsby received her 1/8 share, totaling $87,500.00. She did not object to this distribution.

In July of 2020, after no heir expressed interest in several leftover pieces of Decedent's jewelry, Mr. Reggie sold those pieces of jewelry for scrap metal to Lafayette Coin and Jewelry. He chose to sell the unwanted pieces and distribute the proceeds to the heirs instead of throwing them away.

On September 21, 2020, Gregory F. Reggie, Sr. filed the detailed descriptive list of the Estate of Barbara Dumensil Reggie in the Fifteenth Judicial District Court. On November 21, 2020, he filed a Petition for Possession and Rule to Show Cause. On February 10, 2021, Ms. Hornsby's attorney filed a Motion to Traverse Detailed Descriptive List of Succession Property and several rules to show cause. The hearing on these matters were originally scheduled to be heard on November 22, 2021, and after agreement by all parties, was continued to March 7, 2022.

The trial took place on March 7, 2022 with the ruling announced from the bench on March 8, 2022. The trial court orally granted Mr. Reggie's petition for possession, which placed the heirs in possession of the property distributed to them. The court stated, in relevant part:

> The court finds, after reading the memorandums, after listening to the testimony yesterday, that all of the heirs at that time, January 12[th] of 2020, agreed to how the process was going to work in the selection process, the share that each was going to get, which was approximately $8300.
>
>    . . . .

So at this time the Court finds that the distribution was an in-kind distribution. The Court finds that there was not a sale. Therefore, the question before the Cout is putting the petition for possession. The Court is going to grant that petition for possession.

The accompanying judgment was signed on June 7, 2022. That judgment found, in relevant part, that the petition for possession filed by Mr. Reggie be granted, and the rules to show cause and motion to compel filed by Ms. Hornsby be denied. The judgment of possession became a final appealable judgment on September 2, 2022, which Ms. Hornsby now appeals. In particular, she appeals the trial court's ruling that the distribution of household items was an in-kind partition and not a sale. She seeks nullification of the effects of the partition as it relates to the disposal of household movable property. She further requests that the trial court's denial of her motion to compel be reversed. Professor Elizabeth Carter, a professor of law at the Louisiana State University, Paul M. Hebert Law Center, filed an amicus curiae brief in support of Ms. Hornsby.

## ASSIGNMENTS OF ERROR

The appellant, Barbara Reggie Hornsby, alleges the following assignments of error on appeal:

1. The trial court erred in granting the Executor's petition for Judgment of Possession rendered on June 7, 2022, when (1) there was a lack of agreement amongst all heirs to the voluntary nonjudicial partition process of household movable Succession property as it was executed; and (2) there was a lack of agreement amongst all heirs regarding the final division of household movable Succession property; and (3) Louisiana law requires agreement amongst all heirs to both the process and the final distribution to affect such a partition; and

2. The trial court erred in finding the process utilized by the Executor to affect a nonjudicial voluntary partition of the household movable Succession property was valid when: (1) the Executor conducted several sales in an attempt to partition property; and (2) the Executor did not seek court authorization to conduct those sales as required by Louisiana law; and

3. The trial court erred in denying Appellant's motion to compel discovery when: (1) the denial was predicated on the court's finding discovery was a moot point since the court had granted the petition to have the heirs placed in possession and denied the request for the sales to be nullified, and (2) both of those predicate rulings were made in error.

## ANALYSIS

### *Standard of Review*

The standard of review is disputed. Ms. Hornsby states that the standard of review is de novo, while Mr. Reggie avers that the standard of review is manifest error.

It is well settled that an appellate court's review of a trial court's factual finding is subject to the manifest error of review. In such a case, the reviewing court may not set aside the trial court's finding, unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840 (La.1989). "[W]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Id.* at 844. "This principle is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts." *Succession of Love*, 16-245, p. 4 (La.App. 3 Cir. 9/28/16), 201 So.3d 1027, 1030 (internal citations omitted).

However, when a legal error occurs amidst the fact-finding process, the manifest error standard of review is not applicable. Instead, the appellate court must make its own de novo review of the record. *Evans v. Lungrin*, 97-0541, 97-577 (La. 2/6/98), 708 So.2d 731. "A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when

11

they materially affect the outcome and deprive a party of substantial rights." *Id.* at 735 (internal citations omitted).

One of the primary issues before the court is consent; namely, whether Ms. Hornsby consented to the process of distributing the estate assets. Clearly, determining whether she consented and/or subsequently withdrew her consent is a highly fact-driven process. In fact, Ms. Hornsby herself recognizes the issues before this court are ones of fact, as she stated in her appellate brief that "[t]he key question for this Court is whether there was an agreement between Appellant and all remaining co-legatese that authorized the actions taken by the Executor pursuant to his February 9, 2020, email which changed the partition process set forth in the January 12, 2020 email." Similarly, the question of whether a partition or sale occurred is a fact-intensive process that involves examining the method of distribution.

The questions before this court are factual ones, and therefore the manifest error standard of review applies.

### *Assignment of Error Number One*

In her first assignment of error, Ms. Hornsby alleges that the method of distribution of assets undertaken by Mr. Reggie failed to constitute a valid voluntary nonjudicial partition because she did not consent to the process.

More specifically, Ms. Hornsby does not dispute that she agreed to the terms of the January 12, 2020 email that outlined the bidding process of her mother's movable property. Rather, she alleges that Mr. Reggie unilaterally changed the terms of the bidding process in his February 9, 2020 email and that she never agreed to the changes. She claims that the February 9, 2020 email placed a limit on her bidding power, and that no such limit was set forth in the January 12, 2020 email.

The law is clear that Ms. Hornsby's consent was required in order to partition the movable property absent court approval. To constitute a valid nonjudicial partition, all interested parties must agree to the partition. La.Code Civ.P. art. 4602. If no agreement can be reached among all interested parties, then judicial partition is required. *Id.*

We find that the record supports the trial court's determination that Ms. Hornsby consented to the partition process. Mr. Reggie's January 12, 2020 email at issue states, in relevant part (emphasis added):

> If you select more than your budget, **as long as no one else selects the same things**, you can have those "over budget" items and receive less cash distribution in the end. I hope everyone will be able to get the items most important and useful to them, and if more than one person wants the same item, we can always allow you to "bid it up" until someone gets it.

In other words, Mr. Reggie specifically recognized that the heirs could bid over their $8,300.00 respective budgets, but that they were not entitled to the overbudgeted item(s) when another heir selected the same item(s).

In accordance with the terms of this email, Ms. Hornsby placed bids on her deceased mother's household property on February 8, 2020. Her selections exceeded her $8,300.00 budget and overlapped with many of the selections of the other heirs. On February 9, 2020, Mr. Reggie emailed her and asked her to prioritize her top selections: "**The solution is for you to take the spreadsheet I sent you after our walkthrough and pick the $8300 in items that will be your 'official selections'**" (emphasis in original). Ms. Hornsby replied to that email with several "official selections."

At the trial on this matter, Ms. Hornsby testified that she did not understand what Mr. Reggie meant by "official selections" in his February 9, 2020 email. When

asked at trial if she agreed to Mr. Reggie's proposed solution of picking $8,300.00 worth of "official selections," Mrs. Hornsby said: "I never agreed to changing any of the rules." She testified many times that she was "confused" regarding Mr. Reggie's emails. Ms. Hornsby was asked about her confusion on cross-examination at trial: "Ms. Hornsby, when you received an e-mail from Mr. Reggie that you didn't fully understand, why didn't you call him?" She replied, "I just didn't."

On February 18, 2020, Ms. Hornsby emailed Mr. Reggie and said, "I am pulling my bid on all items." She maintains that this email signified her intent to withdraw from the bidding process entirely.

On the other hand, Mr. Reggie testified that he interpreted that email to mean Ms. Hornsby was merely pulling her bids, not pulling out of the entire process. Mr. Reggie testified that Ms. Hornsby agreed to the process of disposing of the movable household items. He thoroughly explained the bidding process before the trial court and testified as to the emails at issue. He testified that he did not change any of the rules regarding the process. He further testified that when Ms. Hornsby sent the email withdrawing her bids, "she refused to participate in the bidding. But she didn't quit the process…. She – you know, she was still in it, but she didn't want to bid any more."

Following Ms. Hornsby's "I am pulling my bid on all items" email, Mr. Reggie continued to email Ms. Hornsby regarding the items she previously agreed to take. Clearly, these subsequent emails evidence an understanding that Mr. Reggie thought she was still involved in the agreed-upon partition process. Ms. Hornsby could have simply clarified to Mr. Reggie that she was withdrawing from the entire process, but she did not.

We find that the trial court was not "clearly wrong" in its factual findings regarding Ms. Hornsby's consent. Although the "official selections" sentence of the February 9, 2020 email may be open to different interpretations, one interpretation is that it did not constitute a "rule change" as suggested by Ms. Hornsby, but rather further explained and was consistent with the January 12, 2020 email. It is reasonable to assume that Ms. Hornsby's subsequent email responses, in which she set forth her official selections, affirmed her consent to the partition process.

Additionally, Ms. Hornsby's February 18, 2020 email, in which she stated, "I am pulling my bid on all items," can be interpreted in different ways. The plainest and simplest interpretation is that Ms. Hornsby simply wished to pull her bids and receive the cash distribution instead. The language used does not indicate an intent to withdraw her consent to the entire process altogether. We find that the trial court, in its wide discretion over factual findings, was not manifestly erroneous in determining that Ms. Hornsby consented to the partition process.

In her amicus curiae, Professor Carter suggests that ratification of the outcome of the extrajudicial partition is also necessary in addition to consent. She explains that "[e]xtrajudicial partition, therefore, is a two-step process" requiring both consent and ratification. In support, she cites Marcel Planiol & George Ripert, *Treatise on the Civil Law*, Vol. 3, Part 2 §§ 2354 (La. St. Law Inst. Trans. 1959) (footnotes omitted), which states, in part:

> A distribution is valid even if no written record of it was made. The physical distribution of the property suffices, if it is made with the intention to be final. However, the parties run the risk of later proof, because of the restrictions which French law imposes on the proof of contracts. Still, the distribution can be proved by judicial oath.
>
> The validity of distribution without a record has been doubted at times, because Art. 816 declares that action for distribution lies in all cases where distribution has not taken place. But the term "*acte de*

*partage*" must not be understood literally. The statute contemplates the ordinary case of distribution, where the parties draft an instrument in which they state their agreements. If they do not so proceed, there is no reason to derogate from the rules of evidence, and to refuse to recognize a distribution which actually took place, and which the parties admit. Otherwise, distribution would become a solemn act, of which the written record would be an essential element of validity. That would be contrary to the usage in modern law, and also contrary to the very liberal wording of Art. 819.

Despite Professor Carter's reliance on Planiol's treatise, such does not set forth a mandatory requirement of ratification. In fact, Planiol plainly states that "[a] distribution is valid even if no written record of it was made"—in other words, even in the absence of a document signifying ratification.

Beyond that, the application of basic rules of statutory interpretation do not lead to a requirement of ratification. Louisiana Civil Code Article 9 provides that "[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." The applicable article on nonjudicial partition of succession property does not require ratification. It merely requires agreement by all parties. *See* La.Code Civ.P. art. 4602. This article is clear and unambiguous and therefore must be applied as written.

Essentially, Professor Carter asks this court to expand the law to expressly require ratification as a second step in perfecting a nonjudicial partition. We decline to do so.

### *Assignment of Error Number Two*

In her second assignment of error, Ms. Hornsby alleges that the trial court erred in finding that the distribution of the decedent's household movable items constituted a valid nonjudicial partition because Mr. Reggie conducted sales and did not seek court authorization of the sales. Ms. Hornsby alleges that three improper

sales occurred: (1) the partition process for household movable property; (2) the garage/estate sale held on March 18, 2020; and (3) the selling of jewelry to Lafayette Coin and Jewelry. Conversely, Mr. Reggie asserts that the distribution process was an extrajudicial partition requiring no prior court approval.

Louisiana Civil Code Article 1293 states: "The partition of a succession is the division of the effects, of which the succession is composed, among all the coheirs, according to their respective rights." A partition "is a sort of exchange, which the coheirs make among themselves, one giving up his right in the thing which he abandons for the right of the other in the thing he takes." La.Civ.Code art. 1382. Court approval for judicial partitions is not required when the parties reach a mutual agreement regarding a nonjudicial partition. La.Code. Civ.P. art. 4602. Louisiana Code of Civil Procedure Article 4602 dictates two circumstances when partitions must be judicial: "(1) A party is an unrepresented absentee, minor, or mental incompetent; or (2) All the interested parties cannot agree upon a nonjudicial partition."

Mr. Reggie cites the case of *Succession of Matherne*, 472 So.2d 240, 243 (La.App. 1 Cir. 1985) (footnote omitted) to support his contention that the distribution in this case constituted a partition rather than a sale:

> The trial court was correct in holding that this was not a sale, but rather was an agreement to partition as stated in paragraph 12.5. The partition of a succession is the division of the effects, of which the succession is composed, among all the coheirs, according to their respective rights. La. C.C. art. 1293. Partition is a sort of exchange, which the coheirs make among themselves, one giving up his right in the thing which he abandons for the right of the other in the thing he takes. La. C.C. art. 1382. Here, plaintiffs agreed to abandon their rights in the company stock in exchange for cash. Therefore, the trial court concluded that "the mere fact that the Settlement Agreement mentions an exchange of stock for cash does not change the partition into a sale under the code articles and jurisprudence relied upon by petitioners."

17

On the other hand, a sale is defined as "a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties are requirements for the perfection of a sale." La.Civ.Code art. 2439. When a credit sale occurs, a prior court order is required, with such an order specifying "the terms of the sale and the security." La.Code Civ.P. art. 3263. Court authorization for the sale of succession property at private sale is necessary for a succession under ordinary administration. La.Code Civ.P. art. 3281.

We find that the Civil Code's articles on partition apply in this case. Here, the heirs participated in "a sort of exchange" as set forth in La.Civ.Code art. 1382. Mr. Reggie, in accordance with his duties as executor, determined the value of the Decedent's household movable property. The total value was then divided among the heirs, of which Ms. Hornby's share was $8,300.00. Mr. Reggie conducted a simple bidding process which allowed the heirs to select property they wished to keep, or opt for the cash value of their share of the property. This process clearly fits the Civil Code's definition of a partition, which is "the division of the effects of which the succession is composed, among all the coheirs, according to their respective rights." La.Civ.Code art. 1293.

As discussed in the previous section, we find that Ms. Hornsby consented to the bidding process, and thus court approval was not required. Therefore, we find that the trial court did not manifestly err in finding that a partition occurred.

Regarding the jewelry sold to Lafayette Coin and Treasure, Ms. Hornsby similarly states that the jewelry was improperly sold without her consent.

Pursuant to La.Code Civ.P. art. 3261, "[a] succession representative may sell succession property in order to pay debts and legacies, or for any other purpose, when authorized by the court as provided in this Chapter."

18

At trial, Mr. Reggie testified that the jewelry sold to Lafayette Coin and Treasure consisted of "what no one would buy at any reduced price, and no one would take for free." In other words, the jewelry at issue was jewelry that no heir wanted or would even volunteer to dispose of. At this point, Mr. Reggie, as executor, had to decide whether to throw the jewelry away, donate the jewelry, or sell for scrap value.

Mr. Reggie testified:

> What I chose to do was not throw it away and not give it away. I chose to try to put some money in the pocket of the heirs. And so I went to Lafayette – whatever it was called – Coin and Treasure. And I got money for them, instead of me throwing it away.

Mr. Reggie's testimony is consistent with the bidding process outlined in the January 12, 2020 email. He stated in that email, in relevant part: "In the end, any items not selected will be given away—to you, or to charity, or tossed out. We will try to use as little money as possible to dispose of unclaimed items." Ms. Hornsby agreed to the terms of this email and thus agreed that any unclaimed household movable items would be either given away or thrown away.

We find that pursuant to both the January 12, 2020 email, to which Ms. Hornsby does not dispute she agreed to, and the authority granted executors under La.Code Civ.P. art. 3261, Mr. Reggie had the authority to dispose of the unwanted property of the estate. We find that his decision to sell the scrap jewelry, rather than throw the pieces away, was more than reasonable and did not constitute an illegal sale.

### Assignment of Error Number Three

The third assignment of error deals with the trial court's denial of Ms. Hornsby's motion to compel discovery. On February 12, 2021, Ms. Hornsby served

Mr. Reggie's attorney with Interrogatories and Requests for Production of Documents. The information sought in discovery deals with identifying to whom the movable property items went to, so they can be appraised for purposes of a judicial partition. On October 7, 2021, Mr. Reggie submitted responses to these requests. However, Ms. Hornsby alleged that those responses were incomplete and/or not answered. After counsel for both parties participated in a Rule 10.1 Conference on February 14, 2022, Ms. Hornsby filed a Motion to Compel Mr. Reggie to make "full and complete" responses to her discovery requests.

The trial court denied Ms. Hornsby's motion to compel. The denial predicated on its decision to grant the request for the legatees to be placed in partial possession and found the discovery to be unnecessary in light of the trial court's ruling on possession. Because we find that the trial court correctly ruled on the judgment of possession, we find the motion to compel and information sought in the discovery requests to not be relevant to the current matter. We affirm the trial court's denial of the motion to compel.

## DECREE

For the foregoing reasons, the judgment of the district court is affirmed. All costs of this appeal are assessed against Appellant, Barbara Reggie Hornsby.

**AFFIRMED.**